FILED
2019 Jun-04 PM 02:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ALABAMA
# NORTHEASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No.: 2:19-cr-54-LCB |
| ) | |
| JOSE ANTONIO TEJADA-ARDON, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Defendant Jose Antonio Tejada-Ardon filed a Motion to Suppress (doc. 12), and the United States of America (the "United States") filed a response (doc. 14). The Court held a hearing on the Motion to Suppress on April 11, 2019. The parties have also submitted post-hearing briefs. (Docs. 24, 25). Therefore, the Motion to Suppress is ready for review. For the reasons stated below, the Motion to Suppress is granted in part and denied in part.

## I. BACKGROUND

### A. The Encounter with the defendant on December 31, 2018

The events leading up to the arrest of defendant on December 31, 2018, occurred on property owned by United States Steel that borders, in part, I-459 North in Hoover, Alabama, around mile markers 11 and 12. (Doc. 21, pp. 4; Doc. 19-12, p. 2 (Ala. Uniform Incident/Offense Rep., p. 2)). The property consists of

around 135 acres within the city limits of Hoover and is near, or adjacent to, at least one shopping center and a residential neighborhood. (Doc. 21, pp. 21, 23-24, 27-28, 48, 103-04, 109, 115; Doc. 19-1 (Aerial photograph)). The property was leased by Robert Barton for recreational and bow hunting purposes. (Doc. 21, p. 100). Barton's friend, Erik Stahr, was the only other person who had Barton's permission to use the property. (*Id*.). Prior to December 31, Barton had found evidence of hunting activity, including a headless deer and some footprints that did not belong to himself or Stahr. (*Id*. at 101, 118). Because of this, Barton and Stahr went to the property on the morning of December 31 with the intention of placing cameras and putting up more property line markers and boundary signs. (*Id*.).

Barton had forgotten the cameras so he went to I-459 to meet his son, who was bringing him the cameras. (*Id*. at 101). While Barton was gone, Stahr heard gunshots. (*Id*. at 118). Barton eventually met back up with Stahr on the property, and they heard more gunshots. (*Id*. at 101-02, 118). As a result, Barton attempted to make contact with Officer Kerry Bradford with the Alabama Department of Conservation and Natural Resources, but was only able to leave a voicemail. (*Id*. at 113). Barton also called 911 to report illegal hunting activity and to request that City of Hoover police officers respond to the scene. (*Id*. at 20, 103, 119; Doc. 19-12 (Ala. Uniform Incident/Offense Rep., p. 2)). This call occurred approximately around 10 a.m. (*Id*. at 13).

Stahr went to I-459 to meet the Hoover police officers, Officer Cedric Acoff and Officer Hess (collectively, the "Hoover police officers"). (*Id*. at 104). More gunshots were fired after Officer Acoff and Officer Hess arrived. (*Id*. at 7, 21-23). Because of the rough terrain, Starh transported Officer Hess and Officer Acoff, separately, to the property on an all-terrain vehicle. (*Id*. at 22-23). Barton and Stahr informed Officer Acoff that the four individuals did not have permission to be on their leasehold. (*Id*. at 6, 30). Officer Acoff was aware that Barton was or had contacted Officer Bradford. (*Id*. at 29). The four men lined up and then spread out to search the property. (*Id.* at 8, 119). On the ground, there were fresh blood trails and empty shotgun and rifle casings. (*Id*. at 119). Around this time, Officer Bradford called Barton and told Barton that he was on the way; while on the phone with Barton, Officer Bradford heard gunshots. (*Id*. at 47, 106). Officer Bradford had dealt with Barton and Stahr before and testified that the information Barton gives is credible. (*Id*. at 46).

Around fifteen to twenty minutes after the search began, Stahr and Officer Acoff encountered four Hispanic males at or around the same time. (Doc. 21, pp. 8, 13; Doc. 19-12 (Ala. Uniform Incident/Offense Rep., p. 2)). All four men, including the defendant, were armed with a long gun. (Doc. 21, pp. 9-10, 25). Officer Acoff commanded the four men to stop, drop their weapons and let him see their hands; the four men complied. (Doc. 21, pp. 8-10, 30, 120). The four men

3

were ordered to walk to Officer Acoff, which required them to cross a small creek; the four men were then handcuffed. (*Id*. at 10, 30-31, 121). Offier Acoff observed what he believed to be deer hair on the defendant. (Doc. 21, p. 15). Stahr went across the creek to retrieve the four weapons and a backpack. (*Id*. at 31, 121).

Officer Acoff testified that the defendant was the only one of the four who spoke English, and that he may have spoken to the defendant at that point. (*Id*. at 14, 35). Other testimony indicates that there was some conversation between at least the defendant and the Hoover police officers, although the extent or topic of any such conversation is not clear.[1] (*Id*. at 107-10, 124). Officer Acoff did not tell the suspects that they were under arrest because, according to him, he and Officer Hess were there to simply investigate and detain the suspects until Officer Bradford arrived. (*Id*. at 16-17). Officer Acoff never recited to the defendant his *Miranda* rights. (*Id*. at 36). Officer Acoff does not know whether Officer Hess read *Miranda* rights to the defendant. (*Id*.).

The four suspects, including the defendant, were escorted from the property to the right-of-way off I-459; the distance to I-459 was approximately several

---

[1] For example, Barton testified that the Hoover police officers asked about the firearms and where the suspects got them. (Doc. 21, p. 109). Officer Bradford testified that the Hoover police officers told him that the suspects had been found in the woods with weapons and had admitted to shooting two deer. (*Id*. at 42-43). Officer Acoff, however, could not recall whether the defendant made any admission regarding his weapon before Officer Bradford arrived. (*Id*. at 35).

hundred yards. (Doc. 21, p. 31). Although it is not clear how long this walk took, testimony indicates that it was longer than it took to walk into the property (*i.e.*, over fifteen minutes), that defendants were in the woods, that the woods were very steep and the terrain rough, and there was not an easy way to get back to I-459. (*Id*. at 14, 106, 122). Officer Bradford met Officer Acoff and Officer Hess and the four suspects on the right-of-way. (*Id*. at 33).

Officer Bradford guessed that he arrived on the scene around 12:00 or 12:30 p.m. (*Id*. at 38).[2] Officer Bradford observed the four suspects seated on the ground and handcuffed. (*Id*. at 40). While on the scene, Officer Bradford took statements from Barton and Officer Acoff. (*Id*.). Around this time, Officer Bradford also contacted Officer Hinkle with Immigrations and Customs Enforcement ("ICE"). (Doc. 21, pp. 71, 95-96; Doc. 20-3 (DHS Report)). Officer Bradford took possession of the four weapons and the backpack. (Doc. 21, pp. 41, 62). Those weapons were a Winchester Ranger .30-30 (the "30-30 rifle"); another rifle; and two shotguns. (Doc. 21, pp. 35, 51-52, 56-57; Doc. 19-12 (Ala. Uniform Incident/Offense Rep., p. 2)). The backpack contained approximately 230 bullets. (Doc. 21, p. 51).

---

[2] Officer Bradford's report states that he was contacted around 10:55 a.m. by Barton; he testified at the suppression hearing that he was contacted around roughly 10:30 a.m. and later testified that 10:55 a.m. sounded right. (Doc. 21, pp. 38-45; Doc. 19-12 (Ala. Uniform Offense/Incident Rep., p. 2)).

5

Officer Bradford testified that he was told by the Hoover police officers that the four suspects had been found out in the woods, and the defendant had admitted to shooting two deer. (*Id*. at 41-42, 49). Officer Bradford testified that one of the suspects had deer hair and blood on his clothes. (*Id*. at 50). Officer Bradford also determined that none of the suspects, including the defendant, had a hunting license. (Doc. 21, pp. 42, 58). Officer Bradford testified that he did not arrest the four suspects, including the defendant, that day. (*Id*. at 43). Instead, Officer Bradford obtained warrants for the four suspects' arrest the next business day for hunting without permission, hunting without a license, hunting without hunter orange, and failure to possess a buck harvest record. (*Id*. at 43-44, 53; Doc. 19-2 (Ala. Uniform Incident/Offense Rep. Supplement); Doc. 19-9 (Evidence Tracking Form)).

Officer Hinkle arrived on the scene right after Officer Bradford arrived and while Officer Bradford was conducting his investigation. (Doc. 20-3 (DHS Report); Doc. 21, pp. 18, 55, 71)). It is not entirely clear how much time elapsed from when the defendant was initially handcuffed until Officer Hinkle arrived on the scene, however. Officer Hinkle questioned the four suspects, including the defendant, regarding their country of birth, country of citizenship, name, date of birth, and legal status in the United States. (Doc. 21, pp. 76, 98; Doc 20-3 (DHS Report)). Officer Hinkle told Officer Bradford that he believed that the four

6

suspects were unlawfully present in the United States. (*Id*. at 55-56). During a search incident to arrest, two rounds of ammunition were found by Officer Hinkle in the defendant's right front pocket and twenty-one rounds were found in his left front pants pocket. (*Id*. at 57, 63; Doc. 19-9 (Evidence Tracking Form); Doc. 20-3 (DHS Report)).

The four suspects were transported to the Office of Homeland Security in Homewood, Alabama. (Doc. 21, p. 56). While Officer Bradford was standing with Officer Hinkle at the Homeland Security Office, Officer Bradford asked the defendant whether the 30-30 rifle was his, and the defendant said, "Yes." (*Id*. at 62). Officer Bradford never read the defendant his *Miranda* rights. (*Id*. at 65). The defendant was taken into and remained in ICE custody until his January 2, 2019, interview. (Doc. 21, pp. 67, 78; Doc. 20-3 (DHS Report)).

**B.     January 2, 2019, interview by Special Agent Richard Rogers**

Special Agent Richard Rogers ("SA Rogers") with the Department of Homeland Security interviewed the defendant on January 2, 2019. (Doc. 21, pp. 67, 78). At the time of the interview, SA Rogers was aware that defendant was in possession of some form of long gun when he was detained, but SA Rogers was not sure which one it was. (*Id*. at 68-70). SA Rogers does not believe that he had Officer Bradford's evidence tracking report at the time of his interview with the

defendant. (*Id.* at 69). SA Rogers did have Officer Hinkle's report, but it did not identify the defendant as being in possession of the 30-30 rifle. (*Id.* at 70).

Before beginning the interview, SA Rogers read the defendant his *Miranda* rights in Spanish. (*Id.* at 68, 79-81; Doc. 19-8 (Sworn Statement)). SA Rogers has testified that the defendant was under arrest at this point in time. (*Id.* at 88). The defendant waived his *Miranda* rights and gave sworn responses to questions in an affidavit. (*Id.*). The defendant also signed the affidavit, indicating that he was advised that he understood his *Miranda* rights, and that he was willing to make a statement to SA Rogers. (*Id.* at 81; Doc. 19-8 (Sworn Statement)). In his sworn statement, the defendant admitted, among other things, that he once had temporary protective status, but that his document had expired, and that he owned the 30-30 rifle. (*Id.*).

The 30-30 rifle was determined to have been manufactured outside the state of Alabama and had therefore entered interstate commerce. (Doc. 21, p. 68; Doc. 19-10 (Rep. of Investigation)). The defendant was subsequently indicted for being an alien illegally and unlawfully present in the United States in possession of a firearm, the 30-30 rifle.

## II. DISCUSSION

The crux of the defendant's argument appears to be that he was unlawfully detained until he was arrested by Officer Hinkle, and that, because of his unlawful

detention, his arrest and any evidence seized pursuant to that arrest were also unlawful. The Court will therefore address that argument first. The defendant also appears to argue that any incriminating statements made by him to the Hoover police officers and Officer Bradford on December 31, 2018, should be excluded because he was not read his *Miranda* rights. The Court will address that issue second.

### A. The defendant's seizure was lawful

"There are three broad categories of police-citizen encounters for purposes of our Fourth Amendment analysis: (1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez*, 443 F.3d 772, 777 (11th Cir. 2006). Only categories (2) and (3) are applicable to the facts here, as the defendant was almost immediately handcuffed and detained when the Hoover police officers encountered him. The Court need not determine whether the defendant was subjected to an investigative detention by the Hoover police officers or whether he was arrested, however. This is because either type of detention was lawful.

With respect to category (2), a police officer can stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion supported by articulable facts that criminal activity may be afoot. *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (citing *Terry v. Ohio*, 392 U.S. 1, 20 (1968)). The Eleventh

9

Circuit has noted that the reasonableness of an investigative detention is a dual inquiry – whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place. *United States v. Street*, 472 F.3d 1298, 1306 (11th Cir. 2006) (citing *Terry*, 392 U.S. 19-20). Furthermore, the Eleventh Circuit has stated that several issues and circumstances are relevant in distinguishing an investigative detention from an arrest, "including the law enforcement purposes served by the detention, the diligence with which the police pursue the investigation, and scope and intrusiveness of the detention, and the duration of the detention." *United States v. Hardy*, 855 F.2d 753, 759 (11th Cir. 1988).

There was clearly reasonable suspicion to detain the defendant and to justify the detention at its inception. Section 9-11-241 of the Alabama Code states that "[a]ny person who *hunts*, traps, captures, injures, kills, or destroys, or *attempts to hunt*, trap, capture, injure, kill, or destroy any wild game on the lands of another between the hours of daylight and sunset without the written permission of or accompanied by the landowner or person in possession or control of the lands shall be guilty of a misdemeanor . . . ." Ala. Code. § 9-11-241 (emphasis added); (Doc. 21, p. 49 (hunting without permission or license includes the act of pursuing)). It is clear that the Hoover police officers had articulable facts that showed that criminal activity was afoot, specifically that the defendant had, at a minimum,

committed the offense of hunting or attempting to hunt on the lands of another in violation of this code provision. For one, Officer Acoff heard gunshots after he arrived on the property, property that was in the city limits of Hoover, and near, or adjacent to, at least one shopping center and residential neighborhood and bordered by I-459. Barton and Stahr informed the Hoover police officers that the group of men, including the defendant, did not have permission to be on the property. There were fresh blood trails and empty shotgun and rifle casings on the ground. Officer Acoff observed what he believed to be deer hair on the defendant. Furthermore, the defendant was armed with a rifle. Under a totality of the circumstances, there was reasonable suspicion to detain the defendant for violating Section 9-11-241 of the Alabama Code.[3]

Additionally, the law enforcement purposes served by the detention were to investigate hunting and trespassing infractions. The defendant was handcuffed, an intrusive means of detention; however, the defendant had been armed with a weapon in a heavily wooded area, and Officer Acoff had heard gunshots before apprehending the defendant. Moreover, the Court finds that Officer Acoff and Officer Bradford were diligent in pursuing an investigation of the defendant.

---

[3] Section 11-18 of Hoover Code of Ordinances states that it "shall be unlawful for any person to discharge within the city or the police jurisdiction thereof any firearm or air rifle." Officer Acoff testified that he heard gunshots while he was on the property and shortly thereafter encountered the defendant who had a long gun. Officer Acoff would have been authorized to detain (or arrest) the defendant for a violation of this ordinance as well. (Doc. 21, p. 29).

Testimony indicates that the defendant was apprehended deep in the woods and that it took time to walk the defendant out of the rough terrain and onto I-459 where Officer Bradford met them. Testimony also indicates that Officer Hinkle arrived on the scene shortly after Officer Bradford, and that Officer Bradford was present and still conducting this investigation. Furthermore, the record does not indicate that the detention was prolonged in order to allow for the arrival of Officer Bradford or Officer Hinkle on the scene. Officer Bradford testified that he was getting statements and logging evidence while Officer Hinkle was questioning the defendant and the other suspects. (Doc. 21, p. 55).

Although it is not entirely clear how much time elapsed between the time that the defendant was handcuffed and when Officer Bradford arrived on the scene, based on the testimony, the Court estimates that it was approximately one to one and a half hours at most.[4] And this time included time to walk the defendant out of the woods. The Supreme Court has not established a bright line rule with respect to when an investigatory detention is too long. Rather, "in evaluating whether an investigative detention is unreasonable, common sense and ordinary human experience must govern over rigid criteria." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). The Court finds that, under these circumstances and employing

---

[4] The Court bases this estimate on Officer Acoff's testimony that he received the initial call around 10:00 a.m. Officer Acoff and Officer Hess would have then had to respond to the scene and be taken out onto the property by all-terrain vehicle. Officer Acoff testified that the defendant was encountered around fifteen to twenty minutes after the search began. Officer Bradford arrived on the scene around noon or 12:30 p.m.

common sense, the investigative detention of the defendant was reasonable. *See, e.g.*, *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000) (finding detention of approximately 75 minutes was not unreasonable).

Even assuming the defendant was arrested by the Hoover police officers, however, any such arrest was also reasonable. With respect to category (3), a police officer must have probable cause to arrest. *Virginia v. Moore*, 553 U.S. 164, 171 (2008). "This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed . . . an offense." *Rankin v. Evans,* 133 F.3d 1425, 1435 (11th Cir.1998). The officer's own subjective opinions or beliefs about probable cause are irrelevant, because it is an objective standard. *United States v. Street*, 472 F.3d 1298, 1305 (11th Cir. 2006).

Assuming that the defendant was placed under arrest by the Hoover police officers, there was probable cause to support same. "If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001); *Virginia v. Moore*, 553 U.S. 164, 176 (2008) ("We conclude that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the

Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections."). This is true even if the misdemeanor violation is only punishable by fine. *Atwater*, 532 U.S. at 323. The same facts supporting reasonable suspicion to detain the defendant also supported probable cause to arrest him for violating Section 9-11-241 of the Alabama Code, at a minimum. The Court will not repeat those reasons here.

In sum, the Fourth Amendment is not a guarantee against all searches and seizures, only against unreasonable ones. *United States v. Sharpe*, 470 U.S. 675, 682 (1985); U.S. Const. am. IV. And the Court finds that the seizure of the defendant – whether it was an arrest or investigatory detention – in this instance was reasonable. Therefore, the Court will deny the motion to suppress insofar as it requests any evidence discovered as a result of the arrest or detention of the defendant be excluded.

**B. Exclusion of statement given without *Miranda* warning**

The Fifth Amendment states that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. am. V. To protect that right, the United States Supreme Court, in *Miranda v. Arizona*, 384 U.S. 435, 479 (1966), held that an individual subjected to a custodial interrogation must be informed that he has the right to remain silent, that anything he says can be used

against him, that he has the right to the presence of an attorney, and if he cannot afford one, one will be appointed for him. "If the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." *Id*. at 475.

"A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting, in part, *California v. Beheler,* 463 U.S. 1121, 1125 (1983)). Whether a person was in custody prior to his formal arrest depends on whether, under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave. *Id*. "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996).

The defendant does not expressly identify any specific statement that should be excluded. The defendant does identify in his statement of facts one statement made by him in response to a question posed by Officer Bradford at the Office of Homeland Security in Homewood. (Doc. 24, p. 3). The Court finds that the

defendant was under arrest when Officer Bradford asked the defendant whether the 30-30 rifle was his, and the defendant said, "Yes." (Doc. 21, p. 62). It is undisputed that Officer Bradford never read the defendant his *Miranda* rights before asking this question. Therefore, the Court will grant the motion to suppress insofar as it requests the exclusion of the inculpatory statement made by the defendant in response to the question posed by Officer Bradford. Indeed, the United States has conceded this point. (Doc. 25, p. 23).

The Court is hesitant, without more information, to find that any incriminating statement that *might* have been made to the Hoover police officers be excluded. *Cf. United States v. Cook*, No. 2:16-CR-125-KKD-WC, 2016 WL 4744176, at *14 (M.D. Ala. Aug. 23, 2016), *report and recommendation adopted sub nom. United States v. Presley*, No. 2:16-CR-00125-KKD-WC, 2016 WL 4726551 (M.D. Ala. Sept. 9, 2016) ("Further, even if the undersigned wished to suppress such statements, no such statements are in evidence. To the extent that Defendants have moved to suppress statements made in conjunction with their arrests, that motion is due to be denied."). Although it is true that the defendant was ordered, at gun point, to drop his weapon and then handcuffed, this did not *per se* subject him to a custodial interrogation. Additionally, there is no testimony regarding what exact statement was made by the defendant to the Hoover police officers and under what circumstances any statement was made, including whether

any statement was spontaneous, subject to a public safety exception, or part of casual conversation. *See, e.g.*, *United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007) (describing the public safety exception to *Miranda*); *United States v. Jules*, 244 F. App'x 964, 972 (11th Cir. 2007) ("Moreover, the absence of *Miranda* warnings would not preclude the admission of a spontaneous statement."); *United States v. Satterfield*, 743 F.2d 827, 849 (11th Cir. 1984) *abrogation on other grounds recognized in United States v. Edwards*, 728 F.3d 1286, 1292 (11th Cir. 2013) ("Incriminating statements made in the course of casual conversation are not products of a custodial interrogation.").

Finally, the defendant does not appear to take issue with the statement that he gave to SA Rogers. Nonetheless, the Court finds that the record indicates that the defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights before giving his statement to SA Rogers. Moreover, the Court rejects any argument that the admission by the defendant regarding possession of the 30-30 rifle before the interview with SA Rogers somehow tainted the defendant's interview with SA Rogers. There is no evidence that SA Rogers knew at the time of the interview that the defendant had admitted that he possessed the 30-30 rifle; indeed, SA Rogers testified that he only knew that the defendant had been in possession of some form of long gun. Furthermore, to the extent that the defendant argues that the 30-30 rifle should be excluded based on any statement given to the

Hoover police officers without a *Miranda* warning, the Court finds that this argument fails, too. The Eleventh Circuit has found that "*Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement." *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007).

## III. CONCLUSION

Accordingly,

IT IS ORDERED that the Motion to Suppress (doc. 12) is GRANTED IN PART and DENIED IN PART. The Motion to Suppress is GRANTED insofar as it requests exclusion of the identified incriminating statement made by the defendant to Officer Bradford after his arrest. The Motion to Suppress is DENIED insofar as it requests exclusion of any evidence, including the 30-30 rifle, discovered as a result of the detention and arrest of the defendant and any blanket exclusion of any possible incriminating statements made by the defendant to the Hoover police officers.

**DONE** and **ORDERED** this June 4, 2019.

_____
**LILES C. BURKE**
UNITED STATES DISTRICT JUDGE